NATIONAL NEWS BOARD CO. v. ELKHART EGG CASE CO.

(Circuit Court, D. Indiana.   April 1, 1902.)

No. 9,907.

PATENTS—INFRINGEMENT—PAPER BOARD.
　　The McEwan patent, No. 492,497, for an improved paper board made from printed newspaper or the like, by a process described, the essential feature of which is to keep the paper stock as hot as possible during the entire process of manufacture, avoiding the use of cold water and of alkaline or bleaching substances, to the end that the ink may be kept soft and the permanent particles minutely subdivided during the beating process, must be strictly construed in view of the prior art, and is not infringed by board made by a process in which 1 per cent. of soda ash is added to the newspaper stock, and cold water is used in the beating engines.

In Equity.   Suit for infringement of letters patent No. 492,497, issued March 7, 1893, to Robert B. McEwan and others for a new and useful improvement in paper board.   On final hearing.

Briesen & Knauth, Henry M. Turk, and Harvey, Pickens, Cox & Kahn, for complainant.

Van Fleet & Van Fleet, for defendant.

BAKER, District Judge.   This is a suit for alleged infringement of letters patent numbered 492,497, dated March 7, 1893, issued to Robert B. McEwan, Jessie L. McEwan, and Richard W. McEwan "for a new and useful improvement in paper board."   The bill alleges that on March 21, 1893, Robert B., Jessie L., and Richard W. McEwan, by assignment in writing, sold, assigned, and transferred to the McEwan Bros. Company, a corporation, the entire right, title, and interest in and to said invention and letters patent; that on May 31, 1899, the said McEwan Bros. Company, by an assignment in writing, sold, assigned, and transferred to the National Board & Paper Company, a corporation, the entire right, title, and interest in and to said invention and letters patent, including all rights to damages and profits due or accrued, arising out of the past infringement of said letters patent, and the right to sue for and recover the same; that on January 10, 1900, the National Board & Paper Company, by an assignment in writing, sold, assigned, and transferred to the McEwan

Bros. Company the entire right, title, and interest in and to said invention and letters patent, together with all subsisting causes of action belonging to the National Board & Paper Company for infringement of said letters patent subsequent to May 25, 1899, and the right to sue for and recover the same; that on August 10, 1900, the McEwan Bros. Company, by an assignment in writing, sold, assigned, and transferred to the complainant, the National News Board Company, the entire right, title, and interest in and to said invention and letters patent, together with all subsisting causes of action belonging to the McEwan Bros. Company. It is thus shown that the complainant possesses no right of action for any infringement of the letters patent except such as may have arisen between May 25, 1899, and September 3, 1900, when the present bill was filed. The evidence shows that the defendant's mill was operated for about 12 hours on May 25, 1898, in making news board from printed newspapers according to the process described in the patent. But, except on that occasion, the evidence shows that, when manufacturing news board from printed newspapers and the like, the defendant has always used at least one pound of soda ash to each one hundred pounds of newspaper stock. If the defendant infringed the patent on May 25, 1898, the right of action therefor belongs to the National Board & Paper Company, and not to the complainant.

The question for decision, then, is, did the defendant, between May 25, 1899, and September 3, 1900, infringe the complainant's patent by manufacturing news board from newspapers according to the process practiced by it and described in its patent? The patentees claim simply "to have invented a new and useful improvement in paper board." They recognize the manufacture of paper board as old in the arts. The statute provides that:

"Before any inventor or discoverer shall receive a patent for his invention or discovery, he shall make application therefor in writing to the commissioner of patents and shall file in the patent office a written description of the same, and of the manner and process of making, constructing, compounding and using it in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains or with which it is most nearly connected, to make, construct, compound and use the same." Rev. St. 1878, § 4888.

"Accurate description of the invention is required by law for several purposes: (1) That the government may know what is granted and what will become public property when the term of the monopoly expires; (2) that licensed persons desiring to practice the invention may know during the term how to make, construct, and use the invention: (3) that other inventors may know what part of the field of invention is occupied." Bates v. Coe, 98 U. S. 31, 39, 25 L. Ed. 68.

The claim is as follows:

"As a new article of manufacture, a paper board formed from printed newspaper or the like ground to a pulp and having the permanent particles of the printer's ink minutely subdivided and uniformly distributed throughout the body of the board, whereby a smooth and even tint is imparted to the board."

The patent is for a product, but the product is the result of a specified process. The statute requires that the process shall be described "in such full, clear, concise and exact terms as to enable any person skilled in the art * * * to make and construct" news board ac-

cording to the complainant's patent. The patented product is a paper board made according to the process specified in the patent. It is not claimed that the process is novel. Indeed the failure to claim any step in the process raises a presumption that no one of them is novel. Richards v. Elevator Co., 159 U. S. 477, 486, 16 Sup. Ct. 53, 40 L. Ed. 225. The process, then, practiced by the complainant, not being new, it is not quite clear on what ground the product of an old process can be patentable. Judge Bradford says:

"The essence of the alleged invention consists in the retention in the finished product of the printer's ink in minute and distributed particles, unimpaired by chemical action, coupled with an avoidance of any impairment of the fiber through such action." McEwan Bros. Co. v. McEwan. (C. C.) 91 Fed. 787, 790.

But if these results are accomplished by the practice of an old process, we still fail to see how the old process, when practiced by the complainant, can produce any new result. If any better results are obtained, it must be because the complainant exercises greater care and skill in using the old process. But, assuming that the complainant's process is to be regarded as new because it leaves soda ash and bleaching powder out of its process, still it is not claimed that all of the carbon and oily substances contained in the ink were removed by the use of soda ash or bleaching powder. Some part of these substances would doubtless still remain and enter into the paper board. The complainant's process simply leaves more of these substances to enter into the board than would enter if soda ash or bleaching powder were used. Such a change, however, would at most be a change in the amount of carbon and oily substances entering into the board. It is not apparent why leaving out the soda ash or bleaching powder from the old process should constitute an inventive act. If the question were res nova, I should hesitate to hold the patent valid, on the ground that it seems to be wanting in patentable novelty. This question, however, is not open, because the defendant, acquiescing in two former decisions at the circuit, admits the validity of the patent. The defense is noninfringement. This leads to the inquiry, what is the process by which the complainant produces his patented board? In the specification the whole process is thus described:

"In the manufacture of our improved article we preferably use, on account of its cheapness, its freedom from size, and its softness, printed newspaper or other printed paper possessing the characteristic properties of the ordinary paper upon which newspapers are printed, and we have found that old copies of newspapers, or the over-issues, can be bought up at low rates and utilized for our purposes. We have found that our improved product can be manufactured most economically and with the best results by following the process which is described below, but it will be understood that the product can be obtained in other ways. In the process referred to we first cleanse the stock from dust and foreign matter, and soak it in hot water until it is thoroughly soft. Without permitting it to cool we transfer it to the beating engine, and when the pulp is sufficiently beaten it is allowed to pass to the stuff chest, from which it is pumped to the making cylinder vat, and at all times it is kept as hot as possible under the circumstances. We find that this process is expeditious, because, when the ink on the paper has once been softened by the hot water, it is thereafter kept soft instead of being set again by the use of cold water at any point, and the permanent particles of the ink which are not dissolved and washed away are

therefore during the beating more readily subdivided with exceeding minuteness, and are thoroughly and uniformly distributed throughout and blended with the fibers. Our novel product, whether made by the process above described or by any other which may be used in its stead, is a board which has the permanent particles of printer's ink minutely subdivided and uniformly distributed throughout its body to produce a smooth and even tint throughout, while the strength of the fibers has not been impaired by more or less expensive attempts to bleach out the ink."

The salient feature of the process is to keep the paper stock as hot as possible under the circumstances, from the beginning to the end, avoiding the use of cold water and of alkaline or bleaching substances. By keeping the stuff constantly hot the ink is kept soft and the permanent particles of the ink during the beating are more readily subdivided with exceeding minuteness, and are thoroughly and uniformly distributed and blended with the fibers. By the use of cold water at any point, the ink which has been softened by the hot water is set again, thus preventing the subdivision of the permanent particles of ink by the beating process. No method of practicing the invention is suggested except by the application to the paper stock of water as hot as possible from the beginning to the end of the process. It is distinctly stated that if, after the ink has been softened by the use of water as hot as possible, the paper stock is again subjected to an application of cold water, the softened ink is again set, and thus it cannot be readily subdivided in the beating engine. The two indispensable features entering into the manufacture of the patented board are the absence of any alkaline substance and the application of hot water to the paper stuff from the beginning to the end of the process. No board, unless produced by this process or its equivalent, can be held to be an infringement of the patent. The process practiced by the defendant in the manufacture of its board is thus described: We put the papers into our rotary boilers and cook them with a certain amount of soda ash, and after cooking we dump the stuff into a pit and furnish it to our engines, where the stock is beaten in cold water, emptied into a stuff chest, and from there pumped onto the machine. The amount of soda ash is one pound to one hundred pounds of the paper. The newspaper stock is cooked in the rotaries with the soda ash for the period of about six hours. The effect of the cooking with the soda ash is to soften the stock and to cut out the ink by uniting with the grease in the ink, reducing the grease to a soapy condition, which enables us to wash the grease and a large part of the ink out of the stock. The carbon in the ink, being freed from the grease, is in such condition that we are able to wash a large part of it out of the stock. The defendant's process as practiced by it is an old one, and differs in two essential particulars from that covered by complainant's patent, namely, in the use of an alkali, and in using cold water in the beating engines. The defendant's board is not produced by the same process as the complainant's, nor do I regard the two processes as equivalents. It is apparent, and, indeed, is admitted, that the use of cold water in the beating engines prevents the minute subdivision and uniform distribution of the permanent particles of ink obtained by the practice of the process employed by the complainant. Nor do I think it is satisfactorily shown by the evi-

dence that the 1 per cent. of soda ash does not saponify some portion of the oily substances contained in the ink. The general manager of the defendant, who superintends and directs the process of manufacture practiced by it, testifies positively that the soda ash used in cooking the stock in the rotaries does saponify a portion of the oily substances in the ink, which is removed by washing. His testimony is corroborated by a number of employés who have worked in the mill since the defendant began to manufacture board from newspaper stock. The only evidence tending to contradict their testimony is that of complainant's two chemical experts, who form their opinions from chemical analyses made by them of some small specimens of paper board manufactured by the defendant. The burden is on the complainant to prove infringement, and it does not seem to me that the opinion of the chemical experts is sufficient to satisfy this burden. The defendant's witnesses testify from actual, personal experience and observation, and, in my opinion, their testimony is entitled to quite as much weight as the opinions of the chemical experts produced by the complainant. The boards made by the two processes are, no doubt, similar, but they are not the same. The defendant produced two samples of board made from a single bunch of newspapers. One sample was made according to the process of the patent, and the other was made according to the process practiced by the defendant. The difference in the appearance and texture of the two is plainly apparent to the unaided eye. Construing the patent strictly, as I think I must, in view of the prior art, and limiting it to a paper board made according to the specification of the patent, it seems to me that the defendant's board, made by a process differing in essential particulars, is not an infringement.

The bill will be dismissed for want of equity at the costs of the complainant.